NORTH CAROLINA

STANLY COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 813

2018 OCT 16

| ESTATE OF MARLON BRYAN LEWIS, by and through its Administrator, MARCIA WATKINS LEWIS, | ) |
|---|---|

     Plaintiff,

v.

AXON ENTERPRISE, INC., previously
TASER INTERNATIONAL; TIMOTHY
HILL, in his individual and official capacity;
ANDREW FURR, in his individual and
official capacity; SHERIFF GEORGE T.
BURRIS, in his individual and official
capacity; and THE STANLY COUNTY
SHERRIFF'S OFFICE,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT
(JURY TRIAL DEMANDED)**

    **NOW COMES** the Plaintiff Estate of Marlon Bryan Lewis, by and through its Administrator, Marcia Watkins Lewis, to hereby complain of the Defendants by alleging and saying as follows:

**PARTIES**

    1.    Marlon Bryan Lewis (hereinafter "Decedent"), who died in the manner hereinafter alleged, was a citizen and resident of Stanly County, North Carolina at all times relevant to this lawsuit and up until the time of his death on December 15, 2016.

    2.    Marcia Watkins Lewis is a citizen and resident of Stanly County, North Carolina, and she is the duly qualified Administrator of the Plaintiff Estate of Marlon Bryan Lewis, per the Letters Testamentary issued by the Stanly County Clerk of Superior Court. This is an action brought by the Plaintiff pursuant to the North Carolina Wrongful Death Statute, § 28A-18-2.

3. Defendant Axon is an Arizona Corporation with its principal place of business in Scottsdale, Arizona. Axon was and is engaged in the business of selling, designing, manufacturing, distributing, and advertising hand-held electrical weapons (sometimes referred to as "stun guns," "Tasers," "CEDs," "CEWs," among other things), including the Model X26 and X26P, to law enforcement and corrections agencies, among other customers, throughout the United States and Canada. Axon manufactured the Model X26 and X26P cartridges discharged at Decedent, and it is directly responsible for the training program used to train officers of Defendant Stanly County Sherriff's Office (hereinafter "SCSO").

4. Defendant Timothy Hill (hereinafter "Deputy Hill") is a citizen and resident of Stanly County, North Carolina. On December 15, 2016, Deputy Hill was employed with the SCSO. Deputy Hill used an Axon CED, Model X26P against Decedent on December 15, 2016.

5. Defendant Andrew Furr (hereinafter "Deputy Furr") is a citizen and resident of Stanly County, North Carolina. On December 15, 2016, Deputy Furr was employed with the SCSO. Deputy Furr used an Axon CED, Model X26 against Decedent on December 15, 2016.

6. SCSO is an agency and subdivision of Stanly County, North Carolina. Stanly County is vested with the police power of the State of North Carolina pursuant to N.C.G.S. § 160A-281. Defendant Sheriff George T. Burris (hereinafter "Sheriff Burris") is, and at all times relevant hereto was, the supervisory officer responsible for the conduct, hiring, training and supervision of Deputies Furr and Hill, in addition to the management and operations of SCSO. Sheriff Burris is a citizen and resident of Stanly County, North Carolina.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to N.C.G.S. §§7A-240 and 7A-243.

8.     This Court has personal jurisdiction over the Defendants pursuant to N.C.G.S. § 1-75.4.

9.     Venue properly lies in Stanly County pursuant to N.C.G.S. § 1-82.

10.     The Defendants have been properly served and brought before the Court pursuant to Rule 4 of the North Carolina Rules of Civil Procedure.

## TERMS OF ALLEGATIONS

11.     All allegations set forth in this Complaint are based upon information and belief.

12.     All allegations set forth in each of the paragraphs in this Complaint are incorporated by reference into each of the other sections and paragraphs contained in this Complaint, as if fully set forth therein.

13.     At all times pertinent hereto, all employees of the respective Defendants were acting in their capacity as agents of said Defendants, within the scope of their employment and authority, and in the furtherance of the business of the Defendants. All the acts and omissions of the employees of the respective Defendants are imputed to the Defendants, who are liable for such acts and omissions.

## FACTUAL ALLEGATIONS

14.     In the early morning hours of December 15, 2016, Decedent called 911 to report that he was in distress. Various officers from Badin Police Department and SCSO were dispatched to the Decedent's location, in close proximity to a house on Dewey Road in Badin, North Carolina.

15.     Upon arrival, officers found Decedent in an agitated state, claiming to have been chased by dangerous individuals. The Decedent was not armed with any weapons.

16.     Upon arrival, Deputy Hill retrieved his Taser (a model X26P manufactured by Axon), and he tased the Decedent twenty-three (23) times in less than five (5) minutes.

17.     However, at the time of this encounter, Deputy Hill's Taser Certification was expired. In fact, Deputy Hill's Taser Certification expired in December of 2015, approximately one year before his encounter with the Decedent.

18.     At all times relevant to this Complaint, it was the official policy of the SCSO that all officers renew their Taser Certification annually and that all officers who carry a Taser have a current, non-expired Taser Certification.

19.     At all times relevant to this Complaint, it was a violation of SCSO policy for Deputy Hill to carry or utilize a Taser.

20.     While Deputy Hill tased the Decedent twenty-three (23) times, Deputy Furr also tased the Decedent. Simultaneous with Deputy Hill, Deputy Furr deployed his Taser—a Model X26 manufactured by Axon—and tased the Decedent four (4) separate times.

21.     In total, Deputy Hill and Deputy Furr tased the Decedent twenty-seven (27) times over less than a five (5) minute period.

22.     Attached hereto as "Exhibit A" are true and accurate event logs of the Tasers used by Deputy Hill and Deputy Furr to tase the Decedent twenty-seven (27) times over less than a five (5) minute period.

23.     Upon being tased twenty-seven (27) times over less than a five (5) minute period, the Decedent's heart stopped beating, and he began foaming from the mouth. Decedent died laying in the street, surrounded by first responders.

24.     Decedent suffered from a serious heart condition which caused an enlargement of the heart muscle, including a thickening of the interventricular septum, which made him more susceptible to death by the repeated electrical shock emitted from the tasers.

25.     As a direct and proximate result of being tased twenty-seven (27) times over less

than a five (5) minute period, Decedent died.

26. It is never acceptable under any circumstances to tase an individual twenty-seven (27) times over less than a five (5) minute period.

27. It is a violation of SCSO policy to tase an individual twenty-seven (27) times over less than a five (5) minute period.

28. "Tasers" were invented in the mid-1970s by an electrical engineer, Jack Cover, as a use-of-force option for police and correctional officers. Tasers are hand-held weapons that fire two darts, one above the other, connected to wires leading to a cartridge attached to the front of the device. Pulling the trigger fires both darts and discharges pulses of electrical current that radiate through tissue between the darts. The pulses are intended to cause neuromuscular incapacitation that temporarily disable the person shot by the device. Alternatively, when the electrodes on the front of the device are exposed – either through removing the cartridge or by firing it – a person can be shocked by pressing the electrodes into the flesh. Axon refers to this use of its product by the euphemism "drive stun."

29. During the 1990s, Axon discovered that Tasers were not popular among law enforcement and corrections agencies because they did not have high enough stopping power. To boost sales to law enforcement and corrections agencies, and to dominate the then competitive market in Tasers, Axon increased the electrical output by a factor of four, and released the "Advanced TASER Model M26" in late 1999.

30. Axon represented to law enforcement agencies, and to the end users of their products, that the electrical current of the M26 was within established safety margins, and that extensive animal and human testing had demonstrated that the electrical current cannot affect heart rhythms. These claims were false. There were no applicable safety standards. The animal testing

was minimal, at best, and there was no scientific testing on human beings.

31.     In 2003, to accommodate customer preferences, Axon began selling a lighter weight, yet equally powerful electrical weapon, the Model X26. Axon increased the pulse duration for the X26 to 19 times per second. This was far beyond the pulse duration of any previous Taser.

32.     When it first released the X26, Axon designed it to emit a shock for five seconds, then stop, even if the user continued to hold the trigger down. Axon's law enforcement agency customers complained that after the initial five second shock, targets would simply rip the barbs from their body and continue resisting. Axon retrofitted all already-purchased X26 Tasers so that they would continue to shock a target for as long as the user holds the trigger down. All subsequently sold X26 Tasers contained the same "upgrade."

33.     Axon did not properly test or evaluate the risk of cardiac arrest from the X26 before putting it on the market. Axon sold the device to law enforcement and corrections agencies with representations such as "tests have found no effect on heart rhythms" when "tested on animals" (Version 10 Command Demo, Slide 24), and "heart rate unchanged during TASER X26 simulation directly through chest, across heart" (Version 10 Command Demo, Slide 26). Some of these claims were based on research from M26 testing, not X26. Axon knew the science was inadequate to support such claims.

34.     From 2003 until 2014, Axon sold the Model X26 to law enforcement agencies such as the Stanly County Sherriff's Office, either directly, or through distributors, with directions that the agencies train their officers pursuant to Axon training.

35.     For use throughout the training process, Axon issued "training versions" revised every few years, which consisted of instructor and user PowerPoints featuring slides and videos, along with forms, tests, lesson plans, warnings, and other documents. Customer agencies, such as

SCSO, and its trainers and officers, relied on Axon to provide accurate, up to date information on the safe use of the X26 through its training program.

36.     Since it went to market, Axon has lauded the X26 as its "gold standard" in less-lethal weaponry. Sales and use of the X26 have increased exponentially since its release in 2003 and continue to be used despite the model being discontinued in 2014. As its use has continued to increase, there have been a growing number of cardiac arrests associated with its use and a growing number of studies regarding its effects.

37.     Studies of the X26 Taser's effects on heart function began in 2005. In that year, Axon funded a study with one of the nation's leading electrophysiologists (a board-certified cardiologist who is also board-certified in the subspecialty of electrophysiology, the study of the heart's electrical rhythm), Dr. Patrick J. Tchou, M.D and his fellow, Dhanunjaya Lakkireddy, M.D., to design and perform animal testing. Axon approved and funded the testing, which it thought would establish that people on cocaine were less likely to suffer cardiac arrest than those without. Darts were placed in various positions on anesthetized pigs and five-second shocks were delivered using a Model X26 and a custom device modified to deliver increased charges. Pig hearts are frequently used in fibrillation and defibrillation threshold studies with results generalized to humans. The study revealed for the first time that the standard X26 current can "capture" cardiac rhythm—meaning that electrical pulses from the CED override the neural pulses regulating the heart and cause it to beat very fast. The study also documented the close relationship between electrical capture of cardiac rhythm and the location of the darts on the chest. It concluded that darts to the chest are very likely to cause cardiac capture, a potential trigger of cardiac arrest. These results were made available to Axon.

38.     Other studies of the X26 were soon underway. In 2006, eight doctors, led by Dr.

Kumarswamy Nanthakumar, published a peer-reviewed study in the *Journal of the American College of Cardiology* regarding the effects of Axon's X26 and M2 Models on pig hearts. The results of this study confirmed Tchou's findings that the X26 exhibited a very high rate of "capturing" the heart. It found that the X26 would capture the pig heart 98% of the time. While cardiac capture is not always dangerous, it has been found to trigger cardiac arrest due to tachycardia or ventricular fibrillation. These results were made available to Axon.

39.     During 2007 and 2008, a second group of independent researchers, headed by Andrew J. Dennis, D.O., replicated the Tchou-Lakkireddy-Nanthakumar results, documenting ventricular arrhythmias and cardiac arrests from X26 exposures to the chest. The results of these well-constructed experiments were published in three separate peer-reviewed studies: (1) "Acute Effects of TASER X26 Discharges in a Swine Model," *Journal of Trauma*, Vol. 63, No. 3 9/2007: 581-590, (2) "TASER X26 Discharges in Swine Produce Potentially Fatal Ventricular Arrhythmias," Academy of Emergency Medicine, Vol 15, No. 1, 1/2008: 66-73), and (3) "Taser X26 Discharges in Swine: Ventricular Rhythm Capture is Dependent on Discharge Vector," Journal of Trauma, Vol. 65, No. 6, 12/2008: 1478-1487 (the "Dennis Studies"). They provided powerful confirmation that X26 discharges can risk cardiac arrest.

40.     In 2008, Axon learned from a self-funded study that the X26 can deliver up to a 135 microcoulomb charge. This number was much more powerful than the company had originally "rated" the model. Axon updated the product's spec sheet (like a brochure) in February 2009 to reflect that the X26 could deliver a charge of up to 110 to 135 microcoulombs. However, in September 2009, it released a Training PowerPoint for the Model X3 Taser that noted Axon's "tests on aggressive, human volunteers shows that 63 charge units [microcoulombs] is about the optimal level to achieve incapacitation while maximizing safety" (Version 15, Command Demo,

Slide 44). Around the same time, Axon considered retrofitting the X26s so that they would deliver a lower charge but chose not to do so.

41.     In September of 2009, Axon added cardiac hazard warnings in the User Manuals and other documents accompanying the X26 Tasers. It first added a warning for police officers to avoid chest shots and continued adding various cardiac-related warnings between 2005 and 2009. In 2005, it added warnings that Taser use against several at risk populations should be avoided. The list included those with a history of heart attacks, those with cardiovascular conditions, or those whose "system is compromised by…drug intoxication" (X26 Product Warnings, 2005). That same warning packet stated that officers should avoid "prolonged or continuous exposure(s) to the TASER device's electrical discharge. In some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive, repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion, and associated medical risk(s)" (X26 Product Warnings, 2005). The total number of warnings issued with the X26 increased from a few paragraphs to about eight pages between 2005 and 2010. By 2010, the Product Warnings packet for the X26 warned that the device "may capture" a person's heartbeat.

42.     Upon information and belief, at no point did Axon add a warning to its User Manuals or other relevant documents that the X26 was capable of producing a charge of up to 135 microcoulombs, almost twice the level of what Axon claims is safe for cardiac function. Beyond altering the "spec sheet" for the X26 in February of 2009, Axon did not warn subsequent X26 purchasers of this fact, nor did it advise police forces which had already purchased X26s of this fact.

43.     In 2013, Axon introduced the X26P, rated with a "target charge" of 63 microcoulombs. The model X26P included an Automatic Shut-Down Performance Power

Magazine (APPM) Battery Pack. According to Axon, the APPM shuts down the output of the X26P after five seconds of deployment. Also according to Axon, after five seconds deployment duration, the X26P energy burst will stop even if the trigger is still engaged. Contrary to these representations, as with the X26P used upon the Decedent, the X26P does not cut-off after five seconds of deployment but rather continues to shock the target.

44.     In January of 2014, Axon sent letters to its customers stating the X26 would be discontinued by the end of the year. It cited the reason for discontinuation as the "decade-old analog technology," and noted that customers could transition to the X26P. (Form Letter from TASER Int'l to Customers, 1/2014).

45.     In the foregoing fashion, upon information and belief, Axon maliciously, deliberately, wantonly, and negligently failed to alert its customers and users that the X26 could deploy a charge more than twice as powerful as that it claimed was "optimal" for cardiac safety. At the same time, it warned users to avoid chest shots and certain demographics, hoping such warnings would detract from the harm caused by the X26's inordinately high charge output.

46.     Although Axon rates and advertises the X26P's target charge as 63 microcoulombs, in 2014 the Royal Military College of Canada tested the X26P to determine if it operated within military standards. The study found that the X26P's average charge level was actually 82.3 microcoulombs. The highest charge recorded was 90.1 microcoulombs and the lowest was 76.3 microcoulombs. This means that during the experiment, every time the X26P fired, it delivered a charge that was higher than Axon represented, and higher than the level Axon claimed was optimal for a target's cardiac safety.

47.     Axon has willfully and wantonly misrepresented the charge and risks of the X26P to law enforcement agencies, and it has further failed to reasonably warn of the dangers associated

with the X26P, which are the same known dangers associated with the X-26. Further, as a result of misrepresenting the safety of the X26P and X26 in its training materials, Axon has provided false information to law enforcement that was utilized in training officers across the country.

## FIRST CLAIM FOR RELIEF
### Negligence & Gross Negligence
### Against Axon

48. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

49. At all times herein mentioned, Defendant Axon was engaged in the business and profession of designing, manufacturing, selling, distributing, assembling, inspecting, testing, servicing, marketing, warranting, and advertising, the Model X26 and Model X26P, along with providing training to its customers regarding use of these devices. Axon had a duty to exercise reasonable care by either ensuring their products were safe for use on humans or by advising its customers that the devices may not be safe for use on humans.

50. Axon knew or in the exercise of reasonable care should have known that both the X26 and X26P were unreasonably dangerous and defective for use on human beings because, Axon knew, among other things, that both models were capable of, and often did, produce charges that are significantly more powerful than the level that is safe for human cardiac function.

51. At all times herein mentioned, Axon negligently and carelessly designed, manufactured, sold, distributed, assembled, inspected, maintained, tested, marketed, warranted, and advertised, these unreasonably dangerous products to numerous law enforcement agency customers, when it knew or should have reasonably known that they were capable of causing and did in fact cause, serious personal injuries and death to persons while being used in a manner that was reasonably foreseeable. In fact, Axon advertised the product and marketed it in such a way as

to make consumers believe that the product was safe for use on the average civilian, and for use on Decedent.

52.    Axon deliberately chose not to timely and reasonably recall or retrofit the Model X26 or X26P such that they would produce a charge that was safe for cardiac functioning. Defendant Axon deliberately did not inform any law enforcement agency customers about the X26's or X26P's defects or the dangers inherent in those defects.

53.    Axon negligently and carelessly designed, manufactured, sold, distributed, inspected, tested, marketed, warranted, and advertised the Model X26P by not designing the newer model to produce a charge that was within a range safe for cardiac functioning. Given the problems experienced by the X26, it was reasonably foreseeable to Axon that production of an unsafe charge was a significant potential risk for its CED weapons. Axon negligently failed to address this potential defect when it was designing and manufacturing the Model X26P.

54.    As alleged herein, the actions of Axon were done in a manner that reflected a conscious and callous or reckless disregard of the safety and rights of Decedent.

55.    As a direct and proximate result of the gross negligence of Defendant Axon Decedent suffered severe injuries and an untimely death.

56.    Plaintiff alleges that Defendant Axon acted in a willful, wanton, malicious, oppressive, and grossly negligent manner, in conscious disregard of the rights and safety of Decedent and others on whom the X26 and X26P would be used, entitling Plaintiff to recover compensatory, general, and punitive damages, in amounts to be awarded according to proof.

## SECOND CLAIM FOR RELIEF
### Products Liability
### Against Axon

57.    The allegations contained in the foregoing paragraphs are repeated, realleged, and

incorporated herein by reference as if fully set forth.

58.    Axon sold both the X26 and X26P Tasers in North Carolina as "safe," "less-lethal" weapons that could incapacitate a threatening suspect while maintaining maximum cardiac safety for the target. Axon negligently marketed the X26P taser as having an automatic five second deployment duration designed to stop the energy burst even if the trigger was still engaged, when this was untrue. Alternately, Axon negligently designed, manufactured, and sold the X26P taser used to kill Decedent whereby it did not cut-off after five seconds of deployment as marketed.

59.    Axon knew or should have known that both the X26 and the X26P models were actually capable, and often did, produce a charge that was more than twice the "optimal level," for cardiac safety.

60.    Defendant Axon acted negligently in the following ways:

(a)    Axon acted unreasonably in designing both the X26 and X26P in creating products that it knew were more powerful than the level it had determined was safe for cardiac functioning;

(b)    Axon provided inadequate warning or instruction, recall, or retrofit to the Model X26 or Model X26P;

(c)    Axon acted unreasonably in failing to provide such warning or instruction, recall or retrofit;

(d)    Axon's failure to provide adequate warning, instruction, retrofit, or recall of the Model X26 and Model X26P was a proximate cause of the Decedent's death,

(e)    At all times that model X26 and X26P Tasers left the control of the manufacturer or seller, Axon was aware, or in the exercise of ordinary care

should have known that the products posed a substantial risk of harm to public at large, including the Decedent;

(f)    After the products left the control of the manufacturer or seller, the manufacturer or seller failed to take reasonable steps to give timely warning or instruction or to take other reasonable action under the circumstances, such as recalling or retrofitting the X26 or X26P; and

(g)    As will otherwise be proven through discovery and trial.

61.    Axon's negligence was a direct and proximate cause of Decedent's death. As a result of Axon's negligence, Decedent experienced electrical shocks that were well above the level that is safe for human cardiac function. Decedent's heart, already weak from cardiac hypertensive disease, experienced an inordinately powerful electrical current, and it stopped beating.

62.    Axon's conduct was willful, wanton, and malicious, and therefore entitles Plaintiff to recover punitive damages.

### THIRD CLAIM FOR RELIEF
#### Fraudulent Misrepresentation
#### Against Axon

63.    The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

64.    Axon represented to its customers, including the Stanley County Sherriff's Office, all of the material statements set forth herein. Namely it acted and made statements amounting to representations that the X26 and X26P were "safe," "less-lethal" weapons. Axon falsely marketed the X26P taser as having an automatic 5 second deployment duration designed to stop the energy burst even if the trigger was still engaged. Even though Axon added warnings about cardiac risks to the User Manual accompanying the X26 Taser, it deliberately chose not to share, disclose, or

warn of the fact that the X26 and X26P could, and often did, produce charges much more powerful than that which it had determined was safe for human cardiac function. The concealment of material facts surrounding the defects of their products was reasonably calculated to deceive customers that the X26 and X26P Tasers were safe.

65. Axon intended that law enforcement agencies, such as the Stanly County Sherriff's Office, rely on these misrepresentations, and in fact the SCSO did rely on this representation in purchasing, deploying, training, instructing, and otherwise using Axon manufactured X26s and X26Ps as a law enforcement tool in interacting with members of the public, such as Decedent.

66. As a result of Axon's misrepresentations, Decedent died. The misrepresentations and the harm resulting therefrom entitle plaintiff to compensatory, economic, and general damages. Further, Axon's fraudulent misrepresentations were malicious, oppressive, and fraudulent, and constituted despicable conduct entitling Plaintiff to awards of punitive damages.

**FOURTH CLAIM FOR RELIEF**
**Negligent Misrepresentation**
**Against Axon**

67. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

68. Defendant Axon represented to the SCSO and other law enforcement agencies important and material facts described hereinabove.

69. Axon intended that, or negligently disregarded the possibility that, the SCSO as well as other law enforcement agencies and members of the general public, would rely on these misrepresentations. The public-at-large, including the SCSO, did in fact reasonably rely on these misrepresentations.

70. As a proximate result of Defendant Axon's negligent misrepresentations,

Decedent died, and this consequence was reasonably foreseeable. Plaintiff is entitled to economic, compensatory, and general damages therefore.

71.     Additionally, as a result of the willful and wanton nature of Axon's said negligent misrepresentations, Plaintiff is entitled to recover punitive damages.

**FIFTH CLAIM FOR RELIEF**
**Unfair & Deceptive Trade Practices**
**Against Axon**

72.     The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

73.     The above described acts engaged in by Axon affected commerce and constitute both unfair and deceptive acts and practices in violation of N.C.G.S. § 75-1.1 *et seq.*

74.     By reason of that conduct, Plaintiff is entitled to have any damage award trebled. Additionally, Plaintiff is entitled to recover of Axon its reasonable attorneys' fees pursuant to Chapter 75 of the North Carolina General Statutes.

**WAIVERS OF IMMUNITY**

75.     At the date and time alleged herein Deputies Furr and Hill engaged in a malicious use of force against Decedent that exemplified a wanton and reckless indifference to the safety and life of Decedent.

76.     Specifically, Deputies Furr and Hill, simultaneously shocked the Decedent to death, by utilizing their X26 and X26P Tasers, and tasing the Decedent twenty-seven (27) times over less than a five (5) minute time period. Although the officers claimed to the S.B.I. that Decedent continued to struggle while they tased him twenty-seven (27) times, and that the Tasers appeared to have no effect on him, the Pulse Log for Deputy Hill's X26P Taser reveals that there was not enough time between each of his twenty-three (23) separate trigger pulls in which he could have

adequately assessed whether or not the Taser was effective against Decedent or not. The time between the end of one electrical current and Deputy Hill's next trigger pull was often just one or two seconds, and in some cases, less than one second. Further, in the course of just 297 seconds, Hill pulled the trigger twenty-three (23) separate times, delivering an electrical current through Decedent's body for 118 seconds—almost two whole minutes.

77.     Regardless of whether or not Decedent was resisting the officers, Deputies Furr and Hill did not assess whether or not use of their Tasers were still necessary. By failing to do so, they acted with negligent, reckless, malicious, and wanton disregard of Decedent's life.

78.     Deputies Furr and Hill have waived any and all applicable public official immunity to any and all causes of action asserted against them herein, and they must answer for the harms caused by their actions against Decedent.

79.     Further, at the date and time alleged herein Deputies Furr and Hill engaged in an excessive use of force and cruel and unusual punishment of the Decedent that violated a clearly established constitutional protection of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and as such their actions were not objectively reasonable.

80.     As such, both Deputies Furr and Hill have waived their qualified immunity and must answer for the constitutional harms caused by their actions against Decedent.

81.     Additionally, as described herein, Sheriff Burris and the SCSO's conduct was negligent, reckless, malicious, and in wanton disregard of Decedent's life, violated clearly established constitutional protections of the Fourth and Fourteenth Amendments to the United States Constitution, and their actions were not objectively reasonable. Accordingly, they have waived all public official, qualified, sovereign, governmental and/or other immunities that may apply to claims stated herein.

82.     Further, upon information and belief, to the extent the doctrines of sovereign, governmental, public official, qualified immunity, or other immunities may apply to the claims stated herein, the Defendants have waived such immunities through the purchase of one or more policies of liability insurance pursuant to N.C. Gen. Stat. § 153A-435, by purchasing a bond pursuant to N.C. Gen. Stat § 162-8, by participating in a local government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, by settling similar actions or claims, or otherwise.

### SIXTH CLAIM FOR RELIEF
**Deputies Furr and Hill's Use of Excessive Force in the Seizure of Decedent
Violations of the 4th and 14th Amendments to the United States Constitution
Brought Pursuant to 42 U.S.C. § 1983**

83.     The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

84.     At all times relevant to this Complaint, Deputies Furr and Hill were acting under the color of state law as sheriff deputies in the employment of SCSO.

85.     Under the Fourth and Fourteenth Amendments to the United Sates Constitution, Deputies Furr and Hill are prohibited from using excessive force in their efforts to seize, detain, and/or search Decedent.

86.     The actions of Deputies Furr and Hill, as detailed herein, constitute excessive and unlawful force in gross violation of Decedent's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

87.     The force used by Deputies Furr and Hill was intentional, excessive, unreasonable, absent any lawful justification or excuse, unconstitutional, it inflicted unnecessary pain and suffering upon Decedent, and it was the direct cause of Decedent's death.

88.     As a direct and proximate result of Deputies Furr and Hill's unlawful and unconstitutional conduct, as described herein, Plaintiff is entitled to recover damages pursuant to 42 U.S.C. § 1983.

89.     Deputies Furr and Hill's actions, as described herein, and their use of force were intentional, wanton, willful, malicious, blatant and in reckless disregard for Decedent's constitutionally protected rights, and as such, Plaintiff is also entitled to recover punitive damages from Deputies Furr and Hill.

90.     Pursuant to 42 U.S.C. § 1988, Plaintiff is also entitled to recover its attorneys' fees in bringing this action.

### SEVENTH CLAIM FOR RELIEF
**Deputies Furr and Hill's Use of Excessive Force in the Seizure of Decedent**
**Violations of Article I §§ 18, 19, 20 and 21 of the North Carolina Constitution**

91.     The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

92.     These alternative North Carolina Constitutional claims are plead in the event, and to the extent, that this Court finds Plaintiff has no other adequate remedies at law. These claims are brought directly pursuant to North Carolina common law.

93.     At all times relevant to this Complaint, Deputies Furr and Hill was acting under the color of state law as deputies of the SCSO.

94.     Under Article I §§ 18, 19, 20 and 21 of the North Carolina Constitution, Deputies Furr and Hill were prohibited from using excessive force in their efforts to seize, detain, and/or search Decedent, and they were prohibited from violating Decedent's rights to be free from unreasonable seizures of his liberty and person.

95. The force used by Deputies Furr and Hill in seizing Decedent was excessive, unreasonable, absent any lawful justification or excuse, and unconstitutional.

96. As a direct and proximate result of Deputies Furr and Hill's unlawful and unconstitutional conduct, as described herein, Decedent died and Plaintiff is entitled to recover damages in an amount to be determined at trial.

97. Deputies Furr and Hill's actions, as described herein, were intentional, wanton, willful, malicious, blatant and in reckless disregard for Decedent's constitutionally protected rights, and as such, Plaintiff is entitled to punitive damages from Deputies Furr and Hill, and its attorneys' fees, pursuant to North Carolina common law.

## EIGHTH CLAIM FOR RELIEF
### Deputies Furr and Hill's Use of Cruel and Unusual Punishment of Decedent
### Violation of the 8th Amendment to the United States Constitution
### Brought Pursuant to 42 U.S.C. § 1983

98. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

99. At all times relevant to this Complaint, Deputies Furr and Hill were acting under the color of state law as sheriff deputies in the employment of SCSO.

100. Under the Eighth and Fourteenth Amendments to the United Sates Constitution, Deputies Furr and Hill deprived Decedent of his constitutionally protected rights including, but not limited to, the right to be free of cruel and unusual punishment, guaranteed by the Eighth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.

101. The actions of Deputies Furr and Hill, as detailed herein, constitute a deliberate indifference and conscious disregard to Decedent's constitutional rights and violates the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution.

102. The deliberate indifference and conscious disregard of Deputies Furr and Hill to the Decedent's constitutional rights against cruel and unusual punishment was intentional, cruel, excessive, unreasonable, absent any lawful justification or excuse, unconstitutional, it inflicted unnecessary pain and suffering upon Decedent, and it was the direct cause of Decedent's death.

103. As a direct and proximate result of Deputies Furr and Hill's unlawful and unconstitutional conduct, as described herein, Plaintiff is entitled to recover damages pursuant to 42 U.S.C. § 1983.

104. Deputies Furr and Hill's actions, as described herein, and their use of force were intentional, wanton, willful, malicious, blatant and in reckless disregard for Decedent's constitutionally protected rights, and as such, Plaintiff is also entitled to recover punitive damages from Deputies Furr and Hill.

105. Pursuant to 42 U.S.C. § 1988, Plaintiff is also entitled to recover attorneys' fees in bringing this action.

### NINTH CLAIM FOR RELIEF
### Deputies Furr and Hill's Use of Cruel and Unusual Punishment of Decedent
### Violations of Article I §§ 1, 19, and 27 of the North Carolina Constitution

106. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

107. These alternative North Carolina Constitutional claims are plead in the event, and to the extent, that this Court finds Plaintiff has no other adequate remedies at law. These claims are brought directly pursuant to North Carolina common law.

108. At all times relevant to this Complaint, Deputies Furr and Hill were acting under the color of state law as sheriff deputies in the employment of SCSO.

109. Deputies Furr and Hill's acts alleged herein violate Article I § 1 of the North Carolina State Constitution in that the use of excessive force against Decedent violated his due process right to be free from excessive force that amounts to punishment.

110. Deputies Furr and Hill's acts and omissions alleged herein violate Article I § 19 of the North Carolina State Constitution in that the use of excessive force against Decedent results in the deprivation of his life and right to be free from excessive force that amounts to punishment in a manner that is contrary to the law of North Carolina.

111. Deputies Furr and Hill's acts and omissions alleged herein violate Article I § 27 of the North Carolina State Constitution in that the use of excessive force against Decedent constituted cruel and unusual punishment.

112. The deliberate indifference and conscious disregard of Deputies Furr and Hill to the Decedent's constitutional rights against cruel and unusual punishment was intentional, cruel, excessive, unreasonable, absent any lawful justification or excuse, unconstitutional, it inflicted unnecessary pain and suffering upon Decedent, and it was the direct cause of Decedent's death.

113. As a direct and proximate result of Deputies Furr and Hill's unlawful and unconstitutional conduct, as described herein, Plaintiff is entitled to recover damages pursuant to 42 U.S.C. § 1983.

114. Deputies Furr and Hill's actions, as described herein, and their use of force were intentional, wanton, willful, malicious, blatant and in reckless disregard for Decedent's constitutionally protected rights, and as such, Plaintiff is also entitled to recover punitive damages from Deputies Furr and Hill.

115. Pursuant to 42 U.S.C. § 1988, Plaintiff is also entitled to recover its attorneys' fees in bringing this action.

## TENTH CLAIM FOR RELIEF
### Deputies Furr and Hill's Negligence & Gross Negligence

116. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

117. Deputies Furr and Hill owed a duty to Decedent, and the public at large, to act as reasonably prudent persons in their encounters with, choices regarding and use of force against members of the public, including Decedent.

118. As more particularly described herein, Deputies Furr and Hill breached said duty when they encountered the Decedent and tased him twenty-seven (27) times in less than five (5) minutes.

119. Decedent was killed as a result, and Plaintiff is therefore entitled to recover damages for the same.

120. Further, said conduct was willful, wanton, and constituted a conscious indifference to the rights and safety of Decedent. Deputies Furr and Hill's conduct constituted gross negligence, and further entitles the Plaintiff to an award of punitive damages against them.

## ELEVENTH CLAIM FOR RELIEF
### SCSO and Sheriff Burris' Failure to Train and Supervise
### In Violation of the Fourth and Fourteenth Amendments to the United States Constitution
### Brought Pursuant to 42 U.S.C. § 1983

121. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

122. Under the Fourth and Fourteenth Amendments to the United States Constitution, the SCSO is obligated to train and supervise its law enforcement officers in the proper use of force. Pursuant to multiple decisions by federal appellate courts across the country, a sheriff's department is deemed to have an unconstitutional policy when it fails to train or supervise its employees in the

use of force and the use of deadly force, the failure to train or supervise amounts to deliberate indifference to an obvious need for the same, and the failure to train or supervise results in the employee making a wrong decision that results in constitutional violations and injury to a plaintiff.

123.    Deputies Furr and Hill were not adequately trained in the proper use of force, as among other things Deputy Hill's Taser Certification was lapsed.

124.    Sheriff Burris and the SCSO knew that Deputy Hill's Taser Certification was expired, that Deputies Furr and Hill required supplemental training and supervision in Taser use, and their failure to provide the same constituted a deliberate indifference to this need.

125.    At all times relevant to this Complaint, Sheriff Burris, in his official capacity, and the SCSO had an obligation and duty to ensure that Deputies Furr and Hill were reasonably trained and supervised in the use of force and the use of deadly force.  Sheriff Burris was the commanding and supervising officer of Deputies Furr and Hill and was directly responsible for their training and supervision.

126.    The training and supervision provided and/or required by Sheriff Burris, in his official capacity, and the SCSO regarding the appropriate use of force and use of Tasers was inadequate, insufficient, or nonexistent, and Sheriff Burris and the SCSO disregarded and breached their duty to train and supervise Deputies Furr and Hill who were directly under their direction and control.

127.    At all times relevant to this Complaint and prior to, policymakers for the SCSO maintained a deficient program of training and supervision with regards to Taser certification and use that resulted in a violation of Decedent's constitutional rights by untrained officers, especially Deputy Hill.

128.    The SCSO failed to ensure that their employees continued to receive the prudent and recommended training that would ensure their employees knew how to wield Tasers in a

responsible and constitutional manner. Deputy Hill's Taser certification being expired for almost a year is one example of this deficiency.

129. Although the SCSO Conducted Energy Device Policy requires that "[p]roficency training for personnel who have been issued TASER should occur every year," and deems "[t]he Chief Deputy [and Sheriff Burris] responsible for ensuring all members who carry TASER devices have received initial and annual training," the SCSO and Sheriff Burris failed to ensure such a training actually occurred and failed to institute practices that would alert leaders such as the Chief Deputy and Sheriff Burris when a given employee needed to renew his annual TASER training.

130. The actions by policymakers and leaders of the SCSO by failing to ensure the proper training of their employees constitutes deliberate indifference and reckless disregard to the constitutional rights of civilians, including Decedent.

131. The excessive use of force implemented by Deputies Furr and Hill against Decedent was highly likely to occur as a result of the SCSO's and Sheriff Burris' actions, and therefore was something SCSO and Sheriff Burris should have foreseen and taken action to avoid by actively enforcing its CED training policies.

132. As a result of the actions of the SCSO and Sheriff Burris, the force used on Decedent exceeded that which would have been reasonably necessary, or could reasonably have appeared reasonable or necessary, and Decedent's Fourth and Fourteenth Amendment rights were violated.

133. As a direct and proximate result, Decedent suffered an untimely death.

134. Thus, Plaintiff is entitled to recover damages for the same pursuant to 42 U.S.C. § 1983. Plaintiff is also entitled to recover punitive damages against the SCSO and Sheriff Burris, as their conduct was willful and wanton. Plaintiff is entitled to recover a reasonable attorney's fee

and the costs and expenses of this action pursuant to 42 U.S.C. § 1988.

## TWELFTH CLAIM FOR RELIEF
### SCSO's Unconstitutional Pattern, Practice, Custom or Policy
### In Violation of the Fourth and Fourteenth Amendments to the United States Constitution
### Brought Pursuant to 42 U.S.C. § 1983

135.   The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

136.   As alleged herein, the SCSO has engaged in a pattern, practice, policy, or custom of allowing its deputies to use excessive and unlawful force in connection with subduing and/or apprehending individuals.

137.   Deputies Furr and Hill have been allowed to use excessive and unlawful force absent proper supervision or consequence, including excessive physical force and the unlawful use of Tasers.

138.   The SCSO's pattern, practice, policy, or custom of allowing its deputies to use excessive and unlawful force was a direct and proximate cause of Decedent's death.

139.   Upon information and belief, the SCSO has failed to discipline Deputies Furr and Hill for their conduct as alleged herein, and as such it has ratified their improper, willful, wanton, and unlawful actions with respect to the use of force.

140.   As alleged herein, the force used by Deputies Furr and Hill upon Decedent was unreasonable, excessive, absent any lawful justification and/or excuse, and was in keeping with the pattern practice, policy, and/or custom of the SCSO.

141.   As a direct and proximate result of the SCSO's unconstitutional conduct, Decedent was killed, and Plaintiff is entitled to collect damages for the same pursuant to 42 U.S.C. § 1983.

142.   Pursuant to 42 U.S.C. § 1988, Plaintiff is also entitled to recover its attorneys' fees in pursuing this action.

## THIRTEENTH CLAIM FOR RELIEF
### SCSO's & Deputies Furr and Hill's Assault & Battery upon Decedent
### Pursuant to North Carolina Common Law

143.    The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

144.    The conduct of Deputies Furr and Hill both during and after the unconstitutional seizure of Decedent's person, placed Decedent in reasonable fear of immediate harmful or offensive contact, said contact being without lawful privilege or Decedent's consent, in violation of North Carolina law.

145.    Deputies Furr and Hill, by intentional acts or displays of force and violence, threatened Decedent with imminent bodily harm, and such acts or displays caused Decedent to have a reasonable apprehension that harmful or offensive contact with his person was imminent.

146.    The conduct of Deputies Furr and Hill as alleged herein was an excessive and unreasonable use of force against Decedent, and as such, an unlawful assault upon him in violation of North Carolina common law.

147.    The intentional conduct of Deputies Furr and Hill during the unconstitutional seizure of Decedent's person, resulted in an intentional offensive and harmful touching of Decedent's person, without his consent, which contact actually caused Decedent physical pain and suffering, and death, and as such constitutes a violation of North Carolina common law.

148.    The conduct of Deputies Furr and Hill as alleged herein was an excessive and unreasonable use of deadly force against Decedent, and as such constitutes a battery in violation of North Carolina common law.

149. The conduct of Deputies Furr and Hill was intentional and was committed with wanton and willful disregard to rights and safety of Decedent, with the knowledge and belief that injury to Decedent was certain to follow.

150. At all times relevant to the allegations herein, Deputies Furr and Hill were acting in the course and scope of their duties as deputies of SCSO, and their actions and conduct are therefore imputed to the SCSO under the doctrine of *respondeat superior*.

151. As a direct and proximate result of the SCSO's, Deputy Furr's, and Deputy Hill's assault and battery, Decedent died, and Plaintiff is entitled to recover compensatory damages for the same.

152. By intentionally committing an assault and battery upon Decedent, Deputies Furr and Hill and the SCSO are also liable to the Plaintiff for punitive damages.

## FOURTEENTH CLAIM FOR RELIEF
### SCSO's & Sheriff Burris' Negligent and Grossly Negligent Training and Supervision Pursuant to North Carolina Common Law

153. The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

154. The SCSO and Sheriff Burris had a duty to exercise reasonable care in the training and/or supervision of Deputies Furr and Hill in the proper use of force, use of deadly force, and observance of individual constitutional rights.

155. As alleged herein, the SCSO and Sheriff Burris failed to exercise reasonable care in the training and/or supervision of Deputies Furr and Hill in the use of force, use of deadly force, and observance of individual constitutional rights.

156. Such failure by the SCSO and Sheriff Burris constitutes negligence.

157.    As a direct and proximate result of the SCSO's and Sheriff Burris's conduct, Decedent died, and Plaintiff is entitled to recover damages for the same.

158.    Further, said conduct was willful, wanton, and constituted a conscious indifference to the rights and safety of Decedent.  SCSO's and Sheriff Burris' conduct constituted gross negligence, and further entitles the Plaintiff to an award of punitive damages against them.

## FIFTEENTH CLAIM FOR RELIEF
### SCSO's & Sheriff Burris' Negligent and Grossly Negligent Hiring and Retention Pursuant to North Carolina Common Law

159.    The allegations contained in the foregoing paragraphs are repeated, realleged, and incorporated herein by reference as if fully set forth.

160.    The SCSO and Sheriff Burris owed a duty to exercise reasonable care in selecting, hiring, retaining and contracting with law enforcement officers to provide for the well-being and safety of citizens.

161.    The SCSO and Sheriff Burris breached this duty by selecting, hiring, retaining and contracting with Deputies Furr and Hill.  Deputies Furr and Hill lacked the necessary training and supervision to utilize and carry Tasers.

162.    The SCSO and Sheriff Burris knew or reasonably should have known of Deputies Furr and Hill's lack of training, knowledge, certifications and incompetence at the time of their hire or while they were under their employment.  By continuing to employ Deputies Furr and Hill, Sheriff Burris and the SCSO endangered the lives and well-being of Stanly County residents.

163.    As a direct and proximate result of the SCSO's and Sheriff Burris' selecting, hiring, retaining and contracting with Deputies Furr and Hill, Decedent died, and Plaintiff is entitled to recover compensatory damages for the same.

164. Further, said conduct was willful, wanton, and constituted a conscious indifference to the rights and safety of Decedent. SCSO's and Sheriff Burris' conduct constituted gross negligence, and further entitles the Plaintiff to an award of punitive damages against them.

## COMPENSATORY & PUNITIVE DAMAGES

165. As a direct and proximate result of the Defendants' before alleged tortious, and as applicable, unconstitutional conduct, Decedent suffered painful injuries that led to his violent death on December 15, 2016. The Estate of Marlon Bryan Lewis is therefore entitled to recover all damages set forth in N.C.G.S. § 28A-18-2 from the Defendants, jointly and severally, including but not limited to:

    a.    Decedent's expenses incident to his injuries and death;

    b.    Compensation for Decedent's pain and suffering;

    c.    The reasonable funeral expenses of Decedent; and

    d.    The present monetary value of Decedent to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

        i.  Net income of the Decedent;

        ii.  Services, protection, care and assistance of the Decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered; and

        iii.  Society, companionship, comfort, guidance, kindly offices and advice of the Decedent to the persons entitled to the damages recovered.

166. As a direct and proximate result of all of the Defendants' above stated conduct, Plaintiff is entitled to recover general and special damages for the Decedent's wrongful death in

excess of this Court's jurisdictional threshold of twenty-five thousand dollars ($25,000.00).

167.    As more specifically stated herein, the actions of each of the Defendants rise to level of willful and wanton conduct.  Accordingly, Plaintiff is entitled to an award of punitive damages against each of the Defendants.

**WHEREFORE**, Plaintiff prays the Court as follows:

1.    That Plaintiff have and recover from all of the Defendants, jointly and severally, general and special damages, including but not limited to all measures of damages set forth in N.C.G.S. § 28A-18-2;

2.    That Plaintiff have and recover from each of the Defendants punitive damages in the amount of $250,000 or three times compensatory damages, whichever amount is greater;

3.    That in lieu of punitive damages, at Plaintiff's election, that Plaintiff recover from Axon treble damages pursuant to Chapter 75 of the North Carolina General Statutes;

4.    That the costs of this action, including reasonable deposition fees and expert fees, if applicable, be taxed to the Defendants;

5.    Pursuant to the statutes cited elsewhere herein, that all of the Defendants be held liable for Plaintiff's attorneys' fees; and

6.    For such other and further relief as this court deems just and proper.

This the 11ᵗʰ day of October, 2018.

HOWARD, STALLINGS, FROM,
ATKINS, ANGELL & DAVIS, P.A.

By:_____

Robert H. Jessup (State Bar No. :42945)
B. Joan Davis (State Bar No.: 17379)
Rebecca Ugolick (State Bar No.: 48126)
Post Office Box 12347
Raleigh, North Carolina 27605
Telephone: (919) 821-7700
Fax: (919) 821-7703
*Attorneys for Plaintiff*

THE RICHARDSON FIRM, PLLC

By:_____

William O. Richardson (State Bar No: 9433)
Heather L. Rattelade (State Bar No: 38698)
455 Ramsey St.
Fayetteville, NC 28301
Phone: (910) 488-5050
Fax: (910) 339-4373
*Attorneys for Plaintiff*